MORRIS POLICH & PURDY LLP
David J. Vendler, Esq. (SBN 146528)
Email:     dvendler@mpplaw.com
1055 West Seventh Street, Suite 2400
Los Angeles, California 90017
Tel.:    (213) 417-5100
Fax:     (213) 488-1178

MICHAEL R. BROWN, APC
Michael R. Brown, Esq. (SBN 65324)
Email:     mbrown@mrbapclaw.com
18101 Von Karman Avenue, Suite 1900
Irvine, California 92612
Tel.:    (949) 435-3888
Fax:     (949) 435 3801

Attorneys for Plaintiffs, GEORGE and CLAUDIA
CAMBERIS,  and all others similarly situated

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

GEORGE CAMBERIS and CLAUDIA
CAMBERIS, individually, and on behalf of
the class of all others similarly situated,

    Plaintiff,

vs.

OCWEN LOAN SERVICING, LLC,

    Defendant.

Case No.:  CV14-2970 EMC

**PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF CLASS ACTION
SETTLEMENT, APPROVAL OF CLASS
COUNSEL'S FEES, AND CLASS
PLAINTIFFS' INCENTIVE AWARD**

Date:       November 9, 2015
Time:      1:30 p.m.
Ctrm.:     "5"
Judge:     Hon. Edward M. Chen

Action Filed:  June 26, 2014

-1-

**TO THE COURT, DEFENDANT AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 9, 2015 at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Edward M. Chen in Courtroom 5 of the United States District Court, Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, plaintiffs George Camberis and Claudia Camberis ("plaintiffs" or "Named Plaintiffs") will and hereby do move, pursuant to Federal Rule of Civil Procedure 23(e), for an order: (a) determining that the Settlement[1] is fair, reasonable, and adequate; (b) entering the order finally approving the Settlement submitted herewith; (c) approving Class Counsel's attorneys' fees award; and (d) approving the Named Plaintiffs' Case Contribution Awards.

The motion is made on the grounds that: (1) the Class Notice has been effectuated; (2) the Class Notice fairly apprised Class Members of the terms of the Settlement, including the amount that would be requested for attorneys' fees and Case Contribution Awards; (3) the time for receiving claims/exclusions, and lodging objections to the terms of the settlement, as previously ordered in the Court's August 11, 2015 "Order Granting Motion for Preliminary Approval of Settlement" (Document 62) has passed; (4) all requirements for certification of a class action solely for settlement purposes are met (as found in the Court's Preliminary Approval Order); (5) the Settlement is in the best interest of Class Members; and (6) the Class Representatives' attorneys are experienced in complex litigation and have zealously and adequately represented the interests of Class Members in a non-collusive manner.

This motion is based upon: (1) this notice of the motion; (2) the memorandum in support of the motion; (3) the Declarations of: David J. Vendler ("Vendler Decl."), Michael R. Brown ("Brown Decl."), Jeff Scott ("Scott Decl."), Hon. John Leo Wagner, Ret. (Ret.) ("Wagner Decl."), Eric Robin ("Robin Decl."), Pat Pexa ("Pexa Decl."), and Ivey Davis ("Davis Decl."); (3) the pleading and papers previously filed with the Court; (4) the oral argument of counsel; and (5) such additional matter as the Court may consider, including any opposition to any objections of class members –

---

[1] Capitalized terms herein have the same meanings as in the parties' full settlement agreement that is attached as Exhibit 2 to the Declaration of David J. Vendler ("Vendler Decl.") filed in support of plaintiffs' motion for preliminary approval.   See Document 50-2.   That declaration is also incorporated herein insofar as it describes the history of the litigation and its settlement.

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

none of which have been filed as of the filing of this motion.   Additionally, a supplemental declaration of Eric Robin will be filed after the close of the objection/opt out period which will provide the final statistics relating to the participation of the class.


Date: September 14, 2015                            Respectfully submitted,


                                                   By: _____ /s/ David J. Vendler _____
                                                   David J. Vendler
                                                   dvendler@mpplaw.com
                                                   MORRIS POLICH & PURDY LLP
                                                   1055 West Seventh Street, 24th Floor
                                                   Los Angeles, CA 90017
                                                   Telephone:     (213) 891-9100
                                                   Facsimile:     (213) 488-1178

                                                   Michael R. Brown, Esq. (SBN 65324)
                                                   mbrown@mrbapclaw.com
                                                   MICHAEL R. BROWN, APC
                                                   18101 Von Karman Avenue, Suite 1900
                                                   Irvine, California 92612
                                                   Telephone:     (949) 435-3888
                                                   Facsimile:     (949) 435 3801

                                                   Attorneys for Plaintiffs GEORGE CAMBERIS and
                                                   CLAUDIA CAMBERIS, and all others similarly
                                                   situated

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................................... 1

II.   PROCEDURAL HISTORY ........................................................................................... 3

III.  THE BENEFITS OF THE SETTLEMENT TO THE CLASS MEMBERS ARE
      SUBSTANTIAL ........................................................................................................... 6

      A.    OCWEN Has Reported Class Member Payments of Negative
            Amortization For Tax-Year 2013 ..................................................................... 6

      B.    OCWEN Has Reported Class Member Payments of Negative
            Amortization For 2014 ...................................................................................... 7

      C.    OCWEN Will Report Class Member Repayments of Negative
            Amortization For 2015 And Beyond (Unless Contrary Guidance Is
            Published) .......................................................................................................... 7

      D.    Monetary Payments Directly To Class Members ............................................. 8

      E.    Account Adjustments ........................................................................................ 8

      F.    OCWEN Will Pay Costs Of Class Administration And Class Notice ............. 8

      G.    OCWEN Will Pay Plaintiffs' Attorneys' Fees ................................................ 8

      H.    OCWEN Will Pay Class Representative Enhancements ................................... 8

IV.   THE SETTLEMENT IS REASONABLE, ADEQUATE, AND SHOULD BE
      FINALLY APPROVED ................................................................................................ 9

      A.    The Strength Of The Plaintiffs' Case ............................................................ 10

      B.    Settlement Is Appropriate In Light Of The Risks Involved And The
            Results Achieved ............................................................................................ 13

      C.    Maintaining Class Certification ..................................................................... 14

      D.    The Amount Of The Settlement And The Benefits To The Class Were
            The Product Of Hard Fought, Non-Collusive Negotiations And Warrant
            Approval .......................................................................................................... 14

      E.    The Experience And Views Of Counsel Favor Final Approval ..................... 14

      F.    There Has Been No Governmental Objection To The Settlement .................. 15

      G.    The Class Members' Reaction To The Settlement Has Been Extremely
            Positive ........................................................................................................... 16

V.    CLASS COUNSELS' FEE IS REASONABLE AND SHOULD BE
      APPROVED ................................................................................................................ 16

-i-

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF
CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

1

VI.     ENHANCEMENT TO THE CLASS REPRESENTATIVE .................................................... 19

2

VII.    CONCLUSION .................................................................................................................... 20

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Barbosa v. Cargill Meat Solutions Corp.*,
297 F.R.D. 431 (E.D. Cal. 2013) .................................................................................. 10

*Centerior Energy Corp. v. Mikulski*,
553 U.S. 1031, 128 S.Ct. 2426, 171 L.Ed.2d 229 (2008) ............................................ 11

*Chun-Hoon v. McKee Foods Corp.*,
716 F.Supp.2d 848 (N.D.Cal. 2010) ............................................................................ 16

*Churchill Village, LLC v. Gen. Elec.*,
361 F.3d 566 (9th Cir.2004)......................................................................................... 16

*Class Plaintiffs v. Seattle*,
955 F.2d 1268 (9th Cir. 1992)................................................................................... 9, 10

*Curtis–Bauer v. Morgan Stanley & Co.*,
2008 WL 4667090 *4 (N.D.Cal. 2008) ....................................................................... 10

*Deputy v. du Pont*,
308 U.S. 488 (1940)....................................................................................................... 1

*Dukes v. Wal-Mart Stores, Inc.*,
603 F.3d 571 (9th Cir. 2010).......................................................................................... 9

*Eisen v. Porsche Cars North America, Inc.*,
2014 WL 439006 *5 (C.D.Cal. 2014)..................................................................... 16, 18

*Fischel v. Equitable Life Assurance Soc'y of the U.S.*,
307 F.3d 9971006 (9th Cir.2002).................................................................................. 17

*Fraley v. Facebook, Inc.*,
--- F.Supp.2d ----, 2013 WL 4516819 *1 (N.D.Cal. 2013) ......................................... 10

*Garner v. State Farm Mut. Auto. Ins. Co.*,
2010 WL 1687832 *8 (N.D.Cal. 2010) .................................................................. 10, 16

*Glass v. UBS Fin. Servs.*,
2007 WL 221862 * 16–17 (N.D.Cal. 2007) ................................................................ 19

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1988)................................................................................. 10, 18

*Hartless v. Clorox*,
273 F.R.D. 630 (S.D.Cal.2011)..................................................................................... 17

*Horn v. Bank of America, N.A.*,
2014 WL 1455917 *6 (S.D.Cal. 2014) ........................................................... 2, 7, 8, 18

*In re Aremis Soft Corp. Sec. Litig.*,
    210 F.R.D. 109 (D.N.J. 2002) ................................................................................ 12

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935, 942 (9th Cir. 2011) ......................................................................... 18

*In re Equity Funding Corp. of America Securities Litigation*,
    438 F.Supp. 1303 (D.C.Cal. 1977) ........................................................................ 13

*In re Heritage Bond Litigation*,
    2005 WL 1594403 *20 (C.D.Cal. 2005) ............................................................... 13

*In re M.D.C. Holdings Securities Litigation*,
    1990 WL 454747 * 7 (S.D.Cal. 1990) .................................................................... 12

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ............................................................................. 9, 16

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir.2010) ................................................................................... 18

*In re Pac. Enters. Secs. Litig.*,
    47 F.3d 373 (9th Cir.1995) ..................................................................................... 17

*Jacobs v. Cal. State Auto. Ass'n Inter–Ins. Bureau*,
    2009 WL 3562871 (N.D.Cal. 2009) ...................................................................... 19

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir.1998) ............................................................................. 9, 14

*Louie v. Kaiser Foundation Health Plan, Inc.*,
    2008 WL 4473183 (S.D.Cal. 2008) ...................................................................... 19

*Marshall v. Holiday Magic, Inc.*,
    550 F.2d 1173 (9th Cir. 1977) .................................................................................. 9

*McCurry v. C.I.R.*,
    133 F.3d 928 (Table) (9th Cir. 1997) ....................................................................... 7

*Mikulski v. Centerior Energy Corp.*,
    501 F.3d 555 (6th Cir. 2007) .................................................................................. 11

*Molski v. Gleichi*,
    318 F.3d 937 (9th Cir. 2003) .................................................................................... 9

*Murillo v. Pacific Gas & Elec. Co.*, 2010 WL 2889728 *10 (E.D.Cal. 2010) .................................. 15

*Nat'l Rural Telecoms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523, 525 (C.D. Cal. 2004) ................................................................ 9, 16

*Norwest Mortgage, Inc. v. Superior Court*,
    (1999) 72 Cal.App.4th 214 ..................................................................................... 12

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir.1982) .............................................................................. 10, 15

-iv-

*Old Colony R. Co. v. Comm'r. of Internal Revenue,*
  284 U.S. 552 (1932) ........................................................................................... 1

*Pelletz v. Weyerhaeuser Co.,*
  592 F.Supp.2d 1322 (W.D.Wash.2009) ............................................................. 19

*Pemberton v. Nationstar Mortgage LLC,*
  No. 14-cv-1024-BAS (WVG) (S.D.Cal. Feb. 5, 2015) .................................. 5, 11

*Presley v. Carter Hawley Hale Profit Sharing Plan, No. C9704316SC,*
  2000 WL 16437 *2 (N.D. Cal. 2000) ................................................................. 19

*Republic Nat'l Life Ins. Co. v. Beasley,*
  73 F.R.D. 658 (S.D.N.Y. 1977) ......................................................................... 10

*Rodriguez v. West Publishing Corp.,*
  563 F.3d 948 (9th Cir. 2009) ............................................................................... 9

*Singer v. Becton Dickinson and Co.,*
  2010 WL 2196104 (S.D.Cal. 2010) .................................................................... 19

*Six (6) Mexican Workers v. Ariz. Citrus Growers,*
  904 F.2d at 1311 (9th Cir.1990) ......................................................................... 17

*Smith v. Bank of America, N.A.,* ("Smith")
  2:14-cv-6668-DSF-PLA (C.D. Cal. Feb 3, 2015) ................................. 5, 10, 15, 17

*Staton v. Boeing Co.,*
  327 F.3d 938 (9th Cir. 2003) ......................................................................... 7, 19

*Thieriot v. Celtic Ins. Co.,*
  2011 WL 1522385 (N.D.Cal. 2011) ................................................................... 19

*Torrisi v. Tucson Elec. Power Co.,*
  8 F.3d 1370 (9th Cir.1993) ............................................................................ 9, 17

*United States v. Hicks,*
  947 F.2d 1356 (9th Cir.1991) ............................................................................... 7

*Van Vranken v. Atl. Richfield Co.,*
  901 F.Supp. at 299 (N.D.Cal.1995) ................................................................... 19

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048–50 (9th Cir.2002) ................... 13, 17, 18

*Weeks v. Kellogg Co.,*
  2013 WL 6531177 *29 (C.D.Cal. 2013) ............................................................ 18

*Wilshire Holding Corporation v. Commissioner,*
  262 F.2d 51 (9th Cir. 1958) ................................................................................. 1

**Statutes**

26 U.S.C. § 6050H ............................................................................... 1, 11, 17

26 U.S.C. § 6511 ....................................................................................... 5, 12

26 U.S.C. § 6721 ............................................................................................... 11

26 U.S.C. § 7434 ............................................................................................... 11

28 U.S.C. § 1715 ............................................................................................... 15

**Other Authorities**

Manual for Complex Litig. (Fourth) § 21.61 (2004) ....................................... 10

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

For almost all owners of real property, the mortgage interest deduction is their largest single tax deduction and amounts to hundreds, or even thousands of dollars per year in tax savings.  The way home-owners (and the Internal Revenue Service ("IRS")) determine the amount of mortgage interest they have paid during a given year is through the IRS "Form 1098" that is sent to them by their lender (or mortgage servicer) pursuant to 26 U.S.C. § 6050H.  Section 6050H's terms are simple and unambiguous; it requires recipients of "interest"[2] on "any mortgage" (such as OCWEN) to report to both the IRS and to the homeowner on Form 1098 the amount of "interest" the recipient has "received" from the borrower during the "calendar year" if that amount over $600.[3]  The statute does not contain any exceptions, exclusions, or other type of qualifying language excluding particular kinds of "interest," or any type of mortgage from its reporting requirement.

For tax-year 2013, defendant OCWEN Loan Servicing, LLC ("OCWEN") failed to report on the Forms 1098 it issued a total of $68,320,823 in Negative Amortization mortgage interest that was actually paid to it by Class Members in that year.  See Pexa Decl., ¶ 4.  Because taxpayers (and their tax preparers) routinely rely on the amounts listed on Forms 1098 in determining the amount of mortgage interest they can deduct, OCWEN's failure to report Class Members' repayments of Negative Amortization in 2013 inevitably resulted in their losing substantial tax deductions for that year.  As a direct result of this Settlement, OCWEN has not only issued "corrected" Forms 1098 to

---

[2] The Supreme Court has held that the word "interest" in tax statutes is unambiguous and means "the amount which one has contracted to pay for the use of borrowed money."  *Old Colony R. Co. v. Comm'r of Internal Revenue*, 284 U.S. 552, 560-561 (1932).  See also *Deputy v. du Pont*, 308 U.S. 488, 497 (1940)).  (The Ninth Circuit also has held that the definition of interest is easy to apply.  "Roughly, interest is the rental price of money."  *Wilshire Holding Corporation v. Commissioner*, 262 F.2d 51, 53 (9th Cir. 1958)).

[3] The pertinent portion of 26 U.S.C. § 6050H provides that "Any person—

    (1) who is engaged in a trade or business, and

    (2) who, in the course of such trade or business, receives from any individual interest aggregating $600 or more for any calendar year on any mortgage, shall make the return described in subsection (b) with respect to each individual from whom such interest was received at such time as the Secretary may by regulations prescribe.

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

all Class Members reporting the proper amounts of mortgage interest they paid in 2013, i.e. including their repayments of Negative Amortization, but OCWEN has also made the correction system-wide so that Class Members' repayments of Negative Amortization will be reported in future years.  Indeed, as a result of this case, such repayments were included in OCWEN's 2014 interest reporting calculus and the amount of Negative Amortization interest that was reported to Class Members in that year was $81,830,125.  The Settlement in this case also provides that each Class Member who received an incorrect 2013 Form 1098 will be paid the sum of $35.00 to assist them with the expense of amending their 2013 tax returns.  Finally, subject to this Court's approval, the Settlement also provides that OCWEN will pay: (1) Class Counsel attorneys' fees; (2) a Class Representative Enhancement Award; and (3) all costs of class administration.

As described more fully below, the economic benefit to Class Members from all prongs of the Settlement (*not including the value of OCWENs' promise to correctly calculate its borrowers' interest repayments in future years*) is $20,076,665 based on the following components:

- Cash: $556,080.  ($35.00 multiplied by 1588, which is the number of corrected Forms 1098 that OCWEN has sent to Class Members pursuant to the Settlement.  See Pexa Decl. at ¶ 4.

- Increased tax deductions Class Members will get from the IRS by amending their 2013 tax returns using the corrected Forms 1098 that OCWEN has sent to Class Members: $9,154,990.  (As more fully detailed below, this figure is based on the same valuation formula that was used by Judge Curiel in approving a similar class action settlement involving a bank's failure to report repayments of Negative Amortization on Forms 1098. See *Horn v. Bank of America, N.A.*, 2014 WL 1455917 *6 (S.D.Cal. 2014).

- Increased tax deductions Class Members will receive by virtue of OCWEN's inclusion of Class Members' repayments of Negative Amortization in its Forms 1098 issued the Class Members for tax-year 2014: $10,310,595.  (This amount has also been calculated according to the *Horn* formula).

- Class Counsel Fees and Costs: $425,000.  See Vendler and Brown Decls.

- Approximate Costs of Administration: $55,000.  See Robin Decl. at ¶ 2.

- Class Representative Enhancement Award: $7,500.

It should be noted that the value of OCWEN's promise to include its borrowers' repayments of Negative Amortization in the tax-years after 2014 will also be in the multi-millions of dollars but is not included above because it is impossible to calculate with any precision.

Because the Settlement is reasonable given the risks inherent in litigation, and is adequate in terms of the relief being afforded to the Class Members, the Named Plaintiffs are seeking: (1) this Court's final approval of the Settlement, (2) that the Court approval their counsel's $425,000 attorneys' fee request, and (3) that the Court approve their $7,500 Case Contribution Award.

## II.   PROCEDURAL HISTORY

In 2005, the Named Plaintiffs obtained an option adjustable rate mortgage (more commonly known as an "Option ARM" loan) on their home in Danville, California.  The original principal amount of their loan was $494,000.[4]  During the period between February 2013 and December 2013 – when plaintiff sold their home – their loan was serviced by defendant OCWEN Loan Servicing, LLC ("OCWEN").[5]  At the time OCWEN took over the servicing of plaintiffs' loan in February of 2013, plaintiffs' loan balance was $525,026.77, of which $30,526.77 was "Negative Amortization," i.e., interest they had deferred paying in the earlier years of their mortgage, which had been added to the $494,500 they originally borrowed.  When plaintiffs sold their home in December 2013, they paid off the entire then-existing balance of their mortgage, *including the $30,526.77 Negative Amortization amount*.

In or about February 2014, OCWEN issued to plaintiffs a Form 1098 for tax-year 2013.  The Form 1098 OCWEN sent to plaintiff incorrectly stated that plaintiffs had paid only $14,753.50 in

---

[4] "Option Arm" loans provided borrowers with 4 different monthly payment "options."  The first "option" is to make a full payment of the principal and interest due under the note; the second "option" is to pay "Interest Only"; the third "option" is to pay the "Minimum Payment," which is usually less than the monthly interest due; the fourth "option" is to make accelerated payments on a 15-year amortization schedule.  Since the marketing objective of the "Option ARM loan" was to allow consumers to minimize their monthly payment, consumers overwhelmingly chose the "Minimum Payment" option.

[5] This lawsuit only involves only the time during which OCWEN serviced plaintiffs' loan.  Prior to that time, plaintiffs' loan had been serviced by other lenders and servicing companies.

mortgage interest in 2013.  In fact, plaintiffs had repaid $45,280 in mortgage interest that year.  OCWEN's error was that it failed to include in its reporting calculus plaintiffs' repayment of the $30,526.77 in Negative Amortization that existed at the time OCWEN took over Plaintiffs' loan, and which they repaid in its entirety when they sold their home.

Prior to filing this lawsuit, plaintiffs complained to OCWEN about its error and requested that OCWEN correct it.  When OCWEN did not do so, Plaintiffs then filed this action.  Plaintiffs' complaint sought the following relief:

1. Plaintiffs sought to have OCWEN change its Form 1098 reporting to include payments of Negative Amortization.  (This goal is accomplished by the Settlement).

2. Plaintiffs sought to have OCWEN issue corrected Forms 1098 to plaintiffs and to all persons to whom it had issued Forms 1098 that failed to include repayments of Negative Amortization.   (This goal is accomplished by the Settlement).

3. Plaintiffs sought to have OCWEN pay damages to Class Members for the time and expenses that they would incur in amending their prior Tax Returns to correct OCWEN's error.   (This goal is accomplished by the Settlement).

Plaintiffs' case was originally assigned to Magistrate Judge Maria-Elena James.  OCWEN, however, declined to stipulate to Magistrate James's handing the case and it was then re-assigned to this Court on August 26, 2014.  Shortly thereafter, per order of this Court, the parties met and conferred on an alternative dispute resolution method and chose to proceed by way of private mediation using Judge Wagner as mediator.

On August 27, 2014, OCWEN filed its motion to dismiss plaintiffs' complaint.  OCWEN's motion was extensive and complex.  It raised numerous substantive and procedural arguments and cited to approximately 120 cases and statutes.  Plaintiffs filed their opposition to OCWEN's motion on September 26, 2014.  Plaintiffs' opposition was also complex and lengthy.  It was 35 pages long – permission for additional pages had been granted by the Court – and cited to more than 100 cases and statutes.  OCWEN filed a reply on October 7, 2014.  Settlement discussions between counsel started after the briefing on the motion to dismiss had been completed.

1    The parties' negotiations leading up to the Agreement to settle this action spanned many

2   months.  Vendler Decl. at ¶¶ 11-16.  Initially, the parties had several lawyer-to-lawyer discussions

3   relating to the potential structure for a settlement, but did not discuss any "numbers."  Plaintiff also

4   prepared a lengthy request for information to be provided by OCWEN regarding the scope of the

5   class and the amounts of interest that OCWEN had not properly reported.  OCWEN eventually

6   provided the information plaintiffs' requested.  Scott Decl., ¶ 2.  Armed with that information, the

7   parties undertook a realistic analysis of the strengths and weaknesses of the opposing side's

8   arguments and submitted lengthy pre-mediation settlement briefing to Judge Wagner.  Careful

9   consideration was also given by all parties to the potential impact of the passage of time in the case

10   because of the absolutely unmovable three-year limitation for amending Tax Returns imposed by 26

11   U.S.C. § 6511.

12    A formal mediation took place before Judge Wagner on February 6, 2015.  Because two

13   highly relevant cases came down literally in the days immediately prior to the mediation, the parties

14   submitted extensive supplemental briefs to Judge Wagner addressing how those cases affected the

15   settlement landscape (or not).  See *Smith v. Bank of America, N.A.*, ("Smith") 2:14-cv-6668-DSF-

16   PLA (C.D. Cal. Feb 3, 2015) (dkt #28) and *Pemberton v. Nationstar Mortgage LLC*, No. 14-cv-

17   1024-BAS (WVG) (S.D.Cal. Feb. 5, 2015) (dkt #17) ("Pemberton").  See Declaration of Honorable

18   John Leo Wagner, Ret. ("Wagner Decl.") and Jeff E. Scott at ¶¶ 6 and 3, respectively.

19    The mediation session with Judge Wagner lasted into the early evening, but concluded with

20   no settlement.  Over the course of the next several weeks, the parties continued their discussions

21   with Judge Wagner acting as intermediary.  Wagner Decl., ¶ 7.  OCWEN also filed a new motion to

22   dismiss plaintiffs' case on March 5, 2015.  (In light of the then very recent *Smith* and *Pemberton*

23   cases, the Court granted OCWEN's request to file a new motion to dismiss following the initial case

24   management conference).

25    Finally, on March 18, 2015, the parties reached tentative agreement on the essential elements

26   of the Settlement and then negotiated a formal stipulation of settlement.  *Id*. at ¶ 16 and Wagner

27

28

-5-

1   Decl., ¶ 9.  At all times, the negotiations that produced the Settlement were genuinely adversarial

2   and non-collusive.  Wagner Decl., at ¶ 10; Vendler Decl. at ¶ 16, and Scott Decl., at ¶ 6.

3         The Settlement was presented for preliminary approval to the Court on June 12, 2015.  See

4   Document 50.  The Court then requested plaintiffs' counsel to submit their time records to justify

5   their fee (for preliminary approval purposes) on July 22, 2015.  See Document No. 54.  On July 23,

6   2015 Class Counsel provided the Court with their time records and declarations showing that their

7   lodestar was in fact above the amount of their fee request, and the Court then entered its order

8   preliminarily approving the Settlement on August 11, 2015.

9   **III.**  **THE BENEFITS OF THE SETTLEMENT TO THE CLASS MEMBERS ARE**

10        **SUBSTANTIAL**

11        The Settlement benefits the following Class:

12        All persons with Negative Amortization Loans serviced by OCWEN who made
         Payments of Negative Amortization during 2013 that were not reported on Form

13        1098 for Tax Year 2013.[6]

14        The Settlement should be approved as reasonable and adequate because the Settlement

15  achieves all of the objectives Plaintiffs sought in their complaint and avoids the risks inherent in

16  continued litigation.  The Settlement brings the following specific benefits to Class Members.

17        **A.**  **OCWEN Has Reported Class Member Payments of Negative Amortization For**

18        **Tax-Year 2013**

19        Pursuant to the Settlement, OCWEN has filed with the IRS and sent 15,888 corrected Forms

20  1098 to Class Members for Tax Year 2013 that include Class Members' repayments of Negative

21  Amortization that were not reported by OCWEN on the original 2013 Form 1098 OCWEN issued to

22  Class Members.   The aggregate increased interest that OCWEN reported in the corrected 2013

23  Forms 1098 was $68,320,823.  Pexa Decl., ¶ 4.  Because there is still time for Class Members to file

24

25  [6] For definitional purposes, the Settlement Class is limited to Tax Year 2013 because OCWEN

26  determined that any errors related to its reporting of Negative Amortization payments are limited to
   certain loans OCWEN acquired during that year.  Since OCWEN was able to fix its system prior to

27  issuing its 2014 Forms 1098, all of the Class Members had their interest properly reported in that
   year.  Thus, while the Class Members will continue to benefit from the Settlement in years beyond

28  2013, there was no need to include these later years within the scope of the class definition.

amended tax returns for that tax-year, *all* Class Members can recover the ***full amount*** of the deductions they lost as a result of OCWEN's prior incorrect reporting on Forms 1098 for that year. The total value to the class from receiving the corrected Forms 1098 is reasonably calculable, and amounts to $9,154,990.[7]  See *Horn v. Bank of America, N.A.*, 2014 WL 1455917 *6 (S.D.Cal. 2014).

> **B.**   **OCWEN Has Reported Class Member Payments of Negative Amortization For 2014**

As a result of the Settlement, OCWEN has also now correctly reported Class Member repayments of Negative Amortization made in 2014.  This resulted in a total of $81,830,125 in additional interest being reported to the IRS on behalf of Class Members than would have been the case had OCWEN continued to report in the manner in which it originally did for 2013.  Pexa Decl., ¶ 5.  Using the same *Horn* formula, the value to Class Members from having this interest reported is $10,965,236. ($81,830,125 x .20 x .63 = $10,310,595).

> **C.**   **OCWEN Will Report Class Member Repayments of Negative Amortization For 2015 And Beyond (Unless Contrary Guidance Is Published)**

While the value of OCWEN's promise to include repayments of Negative Amortization in tax-years 2015 and beyond cannot properly be included in determining a common fund fee (because of uncertainties such as how many class members will retain their present loans with OCWEN, whether OCWEN will transfer some or all of the Class Members' loans to another party, and/or whether the Class Members will choose to repay their Negative Amortization in any particular year), the case of *Staton v. Boeing Co.*, 327 F.3d 938, 973-974 (9th Cir. 2003) makes clear that such value can and should be weighed as a factor relevant to whether to increase the percentage of the fee to be awarded above the benchmark of 25%.  Here, it is clear from the amounts of Negative Amortization

---

[7] This valuation is based on the same formula used in the *Horn* case.  More specifically, the 15,888 corrected Forms 1098 issued by OCWEN reported an aggregate of $68,320,823.  This amount has been discounted by an assumed 20% marginal tax rate, and then further reduced by 37% to account for the number of tax-payers that do not itemize their deductions ($68,320,823 x .20 x .63 = $8,608,423.  Since the tax code clearly imposes an affirmative duty upon taxpayers to file accurate tax returns (*United States v. Hicks*, 947 F.2d 1356, 1360 (9th Cir.1991) and *McCurry v. C.I.R.*, 133 F.3d 928 (Table) (9th Cir. 1997)), it is fair to presume that Class Members who originally itemized and claimed their interest deduction in 2010-2013 will amend their returns for those years to obtain the additional deductions from this newly reported mortgage interest.

1   interest that were at issue in 2013 and 2014, that OCWEN's agreement to report repayments of

2   Negative Amortization interest in future years will have a value to Class Members in the multi-

3   millions of dollars.

### D.       Monetary Payments Directly To Class Members

5   The value to Class Members from OCWEN's paying them $35.00 for each corrected Form

6   1098 that OCWEN issued for tax-year 2013 is $554,080 – (15,888 x $35.00).  See Pexa Decl. at ¶ 4.

7   The $35.00 per Class Member payment is intended to help defray the cost of amending their 2013

8   tax returns.  It is a sum that was the product of vigorous negotiations.  Given the risks of litigation

9   generally (and the more specific risk that even if plaintiffs prevailed on liability, this particular

10  element of damages (accountancy fees required to amend tax returns) would be awarded by the

11  Court), Class Counsel believed that this sum was reasonable for a settlement.   (In the *Horn* case, for

12  instance, one class member submitted a declaration that she only had to pay $75.00 to amend her tax

13  return.  See Davis Decl. as Exhibit "B" to the Vender declaration filed herewith.

### E.       Account Adjustments

15  OCWEN has made appropriate adjustments to Class Members' mortgage accounts to ensure

16  that their repayments of Negative Amortization are properly credited to their accounts.

### F.       OCWEN Will Pay Costs Of Class Administration And Class Notice

18  OCWEN will be responsible for all class administration charges.  The value of this prong of

19  the settlement is estimated to be approximately $55,000.  Robin Decl., ¶ 2.

### G.       OCWEN Will Pay Plaintiffs' Attorneys' Fees

21  On July 23, 2015, Class Counsel submitted to this Court detailed declarations and their time

22  records justifying their request for $425,000 in attorneys' fees and costs.  OCWEN has agreed to not

23  to oppose this award for the services provided by plaintiffs' counsel on behalf of the Named

24  Plaintiffs and the Settlement Class.

### H.       OCWEN Will Pay Class Representative Enhancements

26  The Settlement provides that OCWEN will pay $7,500 to each of the two class

27  representatives for their contributions to the case.

28

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF
CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

**IV.    THE SETTLEMENT IS REASONABLE, ADEQUATE, AND SHOULD BE FINALLY APPROVED**

The purpose of this second stage of the class action approval process -- the "final approval" hearing – is for the court to finally determine whether the parties should be allowed to settle the class action pursuant to the terms agreed upon.   *Nat'l Rural Telecoms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004).   "The 'universally applied standard' in determining whether a court should grant final approval to a class action settlement is whether the settlement is 'fundamentally fair, adequate, and reasonable.' [Citations omitted].   *Id.*   See also, *Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992)*; In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 458 (9th Cir. 2000); and *Marshall v. Holiday Magic, Inc*., 550 F.2d 1173, 1178 (9th Cir. 1977).

The Ninth Circuit has identified the following factors for courts to weigh in determining whether a proposed class action settlement meets this standard:

> (1)     The strength of the plaintiff's case;
>
> (2)     The risk, expense, complexity, and likely duration of further litigation;
>
> (3)     The risk of maintaining class action status throughout the trial;
>
> (4)     The amount offered in settlement;
>
> (5)     The extent of discovery completed and the stage of the proceedings;
>
> (6)     The experience and view of counsel;
>
> (7)     The presence of a governmental participant; and
>
> (8)     The reaction of the Class Members to the proposed settlement.

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir.1998); *Rodriguez v. West Publishing Corp*., 563 F.3d 948, 963 (9th Cir. 2009) (quoting *Molski v. Gleichi*, 318 F.3d 937, 953 (9th Cir. 2003) overruled on other grounds by *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)).

These factors cannot be applied mechanically; even a single factor sufficiently favoring settlement may outweigh all the others.  *Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1376 (9th Cir.1993).   The over-arching test is whether "the interests of the class are better served by the settlement than by further litigation."   *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687832

*8 (N.D.Cal. 2010) (quoting Manual for Complex Litig. (Fourth) § 21.61 (2004)).   Thus, "the decision to approve or reject a settlement [under Rule 23(e)] is committed to the sound discretion of the trial Judge."   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988).   However, this discretion must be exercised bearing in mind the strong policy favoring the compromise and settlement of class actions.   *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.1982); *City of Seattle*, 955 F.2d at 1276; *Garner* at *8; *Curtis–Bauer v. Morgan Stanley & Co.*, 2008 WL 4667090 *4 (N.D.Cal. 2008) ("[T]he court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class action law suits.")

The fairness of a settlement must be evaluated as a whole, rather than by assessing its individual components.   *Hanlon*, 150 F.3d at 1026.   Thus, the question is not whether the settlement is perfect, or even whether it could have been better, but is just whether the settlement is within the realm of reasonableness.   *Id.* at 1027 and *Garner *8*; and *Fraley v. Facebook*, *Inc.*, --- F.Supp.2d ----, 2013 WL 4516819 *1 (N.D.Cal. 2013).   "Settlements are afforded a presumption of fairness if (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."   *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 445 (E.D. Cal. 2013).   Put another way, approval should be granted unless the settlement, "taken as a whole, is so unfair on its face as to preclude judicial approval."   *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (citations omitted).

When the above legal standards are applied to the Settlement presently before the Court, approval is the only reasonable result.

## A.   The Strength Of The Plaintiffs' Case

This case was hardly a "slam dunk" for the plaintiffs.   Their theory for imposing liability is novel and, as was ably pointed out in OCWEN's two motions to dismiss, there were many legal hurdles which could have derailed their cause.   The Court could have decided on OCWEN's Motion that the IRS has exclusive enforcement jurisdiction (as was held in *Smith*), or it could have decided to refer the issue of whether payments of deferred interest must be reported on Form 1098 to the IRS

-10-

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

1    under the doctrine of primary jurisdiction, as Judge Bashant did in the Southern District of California

2    case of *Pemberton, et al. v. Nationstar Mortgage LLC* (So.D.Cal. Case No. 3:14-cv-01024).  There

3    was also the possibility that the IRS could intervene in the case and assert a position contrary to the

4    plaintiffs, i.e. that it had exclusive jurisdiction over OCWEN's reporting policies since there are

5    specific IRS penalties applicable to issuers of erroneous informational returns.   See 26 U.S.C.

6    § 6721.

7          There were also potential difficulties specific to plaintiffs' several state law claims.  OCWEN

8    argued, for instance, that since there was no private right of action under 26 U.S.C. Section 6050H,

9    plaintiffs could not bring any *state law* claims for damages premised on a lender's purported

10    noncompliance with the Form 1098 reporting requirements.  OCWEN argued that because 26 U.S.C.

11    § 7434 provides a private right of action for taxpayers to sue for the wrongful issuance of certain

12    types of informational returns, *but not Forms 1098*, Congress had implicitly determined that no such

13    suits based on state law should lie.  And, while *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555

14    (6th Cir. 2007) (*en banc*), *cert. denied*, *Centerior Energy Corp. v. Mikulski*, 553 U.S. 1031, 128 S.Ct.

15    2426, 171 L.Ed.2d 229 (2008) favors plaintiff's position on this point -- that they could sue under

16    state law theories -- it is the only case nationally to address whether 26 U.S.C. § 7434 is preemptive

17    over state law claims.  There is no Ninth Circuit authority on point.

18          Third, OCWEN also argued that because the IRS has never taken a formal position in any

19    published regulation (or even in a private letter ruling) that repayments of Negative Amortization

20    must be reported on Forms 1098, plaintiffs' case could not succeed.

21          These are just some of the many hazards that could have derailed plaintiffs' action entirely,

22    or left it in litigation limbo for years.  Indeed, as these issues are mostly matters of first impression,

23    or in which case law is sparse, this case could well have ended up in the Ninth Circuit no matter

24    which side won at trial.  There were also other significant pitfalls, including the risk that plaintiffs'

25    contract-based claims would fail because the Bank's mortgage contract makes no mention of any

26    1098 reporting obligation, or that the IRS could decide (perhaps at OCWEN's instance) to issue a

27

28

regulation governing the reporting of deferred interest in the mortgage context that differed from plaintiffs' view.

If the contract claims failed, plaintiffs would have been left with only their UCL claim, which arguably could not be made the foundation for a national class. *Norwest Mortgage, Inc. v. Superior Court*, (1999) 72 Cal.App.4th 214, 222 (California statutes generally do not have extraterritorial reach).

Thus, while litigation is never free of uncertainty,[8] this case was extremely uncertain.

But there was also another factor that makes this settlement especially beneficial to the Class – time.  While a great many cases hold that early settlements generally benefit all parties and the Court,[9] this was particularly true in the unique circumstances of this case because of the three-year period for filing amended tax returns – 26 U.S.C. § 6511; delays in concluding this case could have resulted in Class Members' forever losing the ability to recover their lost deductions from the IRS. This would have also made resolution of the case substantially more difficult since funds to recompense Class Members for such years would then have had to come from OCWEN and not the IRS.  Any settlement then would have likely then included a "settlement discount" as opposed to the 100% recovery the class can now obtain.

Because of the immoveable 3-year statute of limitations for amending tax returns imposed by 26 U.S.C. § 6511, it was a virtual certainty that the longer this case was litigated, the worse the end result would be for the class.  A trial (and inevitable post-trial appeals) would have taken years to conclude and would have ensured that Class Members could never have recovered the full value of their lost deductions from the IRS, *as they can do now.*  Without a Settlement, their sole avenue of recovery would have been from OCWEN, which was hardly a sure-fire bet given the litigation risks involved.

---

[8] *In re Aremis Soft Corp. Sec. Litig.*, 210 F.R.D. 109, 125 (D.N.J. 2002) ("Regardless of the strength of case counsel might present at trial, victory in litigation is never guaranteed."

[9] *In re M.D.C. Holdings Securities Litigation*, 1990 WL 454747 * 7 (S.D.Cal. 1990) "Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done."

Class Counsel also had to consider that the Class Members are comprised primarily of financially distressed homeowners.  After all, this was the reason many people chose an Option Arm loan in the first instance.  The simple fact is that the window of obtaining monetary relief from the IRS through amending prior tax returns was, and is, a vanishing one by statute.  It simply would not have been available if the case had proceeded to a later settlement or trial.

The final factor adding to the risk of taking on the case was that OCWEN is represented by one of the largest and most prestigious law firms worldwide with a reputation for delivering skill and experience in complex litigation.  *In re Heritage Bond Litigation*, 2005 WL 1594403 *20 (C.D.Cal. 2005) ("the quality of opposing counsel is important in evaluating the quality of Plaintiff's counsel's work"); *Vizcaino*, 142, F.Supp.2d at 1303.  *In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1337 (D.C.Cal. 1977) ("plaintiffs' attorneys in this class action have been up against established and skillful defense lawyers, and should be compensated accordingly.")  In this case, it was clear from the depth of its motions to dismiss that OCWEN was fully prepared to vigorously litigate this issues with its chosen counsel.

Given the potential legal pitfalls and the virtually unlimited resources available to OCWEN to litigate, the near complete victory the Settlement brings to the class overwhelmingly supports granting this motion.

## B.   Settlement Is Appropriate In Light Of The Risks Involved And The Results Achieved

This factor also overwhelmingly supports upholding the Settlement.  As described above, the risks involved were high and the Settlement is nothing short of a home run for Class Members.  At the time the Settlement was agreed to, both sides were at great risk from the upcoming motion to dismiss.  The plaintiffs faced the potential that their action could be dismissed (or sent to the IRS), while OCWEN faced the potential for an injunction that would potentially cause great unrest within its organization.  Either way, since there were essentially no factual disputes at issue, the hearing on the motion to dismiss had the potential to be dispositive of the entire case.  A favorable settlement prior to that ruling is certainly appropriate and supports granting the motion.

1    **C.    Maintaining Class Certification**

2         While OCWEN would surely have made some arguments against class certification,

3    plaintiffs' view has always been that class certification is appropriate in this case since the OCWEN

4    committed the same wrong as to every Class Member.  Plaintiffs thus believe that they would have

5    been able to maintain class status throughout trial.  Indeed, this Court found as part of the

6    preliminary approval motion that all of the requirements for class certification were met.  That ruling

7    was correct.  This factor therefore supports approval of the Settlement.

8    **D.    The Amount Of The Settlement And The Benefits To The Class Were The**

9         **Product Of Hard Fought, Non-Collusive Negotiations And Warrant Approval**

10        This Settlement was only achieved after very hard fought negotiations and extensive

11   settlement-oriented information sharing between the parties spread over the course of almost a year.

12   OCWEN provided information to plaintiffs' counsel including, *inter alia*: (a) when it started not

13   reporting Class Members' repayments of Negative Amortization interest on the Class Member

14   mortgages; (b) how many mortgages were affected; and (c) the aggregate amounts of deferred

15   interest per year that had not been properly reported.  This allowed plaintiffs "sufficient information

16   to make an informed decision about settlement."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234,

17   1239 (9th Cir.1998).  See generally, Scott Decl., ¶ 2 and Vendler Decl. filed in support of plaintiffs'

18   motion for preliminary approval (Document 50-2).  Each side also prepared extensive briefing on the

19   legal and factual arguments supporting their respective positions. *Id*.

20        Further Class Counsel's fee was only negotiated (with the assistance of Judge Wagner) after

21   all of the terms affecting the Class Members were fully negotiated.  See Wagner Decl., ¶ 7 and Scott

22   Decl., ¶ 4.  In fact, all the fee negotiations were handled solely by Judge Wagner and that that

23   process not commence until after the class recovery had been set.  Wagner Decl., ¶ 7.  Judge Wagner

24   thus conducted all of the fee negotiations and there were no direct communications between

25   plaintiffs' and defense counsel on this subject. *Id*.  See also Scott Decl., ¶ 4.

26   **E.    The Experience And Views Of Counsel Favor Final Approval**

27        "When approving class action settlements, the court must give considerable weight to class

28

counsel's opinions due to counsel's familiarity with the litigation and its previous experience with class action lawsuits." *Murillo v. Pacific Gas & Elec. Co.*, 2010 WL 2889728 *10 (E.D.Cal. 2010); *Officers for Justice v. Civil Serv. Comm'n of the City & County of S.F.*, 688 F.2d 615, 625 (9th Cir.1982).   Here, Class Counsel not only have substantial class action experience, but particular experience in bringing class actions against the financial services industry and, even more specifically, in the area of tax law and tax reporting.  See Vendler and Brown Declarations at ¶¶ 25-31 and 30-52, respectively.  Based on their extensive experience, Class Counsel believe that the Settlement is not only "adequate," but a tremendous victory for the class.

This is not a coupon-type settlement where class members get no real value while the attorneys walk away flush.  Rather, this Settlement puts tens of millions of dollars – in many cases thousands of dollars per Class Member – directly into Class Members' pockets.  OCWEN has also agreed to pay each Class Member $35.00 in cash, and to pay all of Class Counsel's attorneys' fees and costs of class administration.

Given the recent (albeit wrongly decided) *Smith* case (and the general uncertainty of the case law in this area as described above), the risks in continuing this litigation were great.  In the face of this uncertainty, the Settlement achieves literally everything the Named Representatives sought in their complaint and eliminates the risk of an eventual loss.  Because the Settlement can only be described as a "home run" for Class Members, Class Counsel recommend its approval.

**F.      There Has Been No Governmental Objection To The Settlement**

Pursuant to the Class Action Fairness Act ("CAFA"), OCWEN was obligated to notify the United States Attorney General and certain other federal and state officials as a condition of obtaining Court approval.  See 28 U.S.C. § 1715.  A list of the officials notified appears on Exhibit "A" to the Declaration of Jeff Scott.  Despite this notice, no state or federal officials have raised any objection to the Settlement.  "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the

normal course of the class action settlement procedures."  *Garner*, 2010 WL 1687832 *14.  This factor favors approval of the Settlement.

### G.   The Class Members' Reaction To The Settlement Has Been Extremely Positive

The positive response of the Class Members to the Settlement is best demonstrated by the fact that out of more than 19,000 notice packets, only 6 timely requests for exclusion have been received (Robin Decl. at ¶ 3 and Exhibit "A" thereto) and that only one "objection" has been filed. (The one "objection" that has been filed, however, comes from a Class Member who does not claim that the settlement is inadequate, or that it should not be approved.  Rather, the "objection" appears to arise from the Class Member's misunderstanding the class notice and her general dissatisfaction with OCWEN.  A supplemental declaration of Mr. Robin will be filed after the objection/opt out period has expired setting forth the full class participation statistics.

"The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the settlement are favorable to the Class Members."  *Eisen v. Porsche Cars North America, Inc.,* 2014 WL 439006 *5 (C.D.Cal. 2014), (quoting *Nat'l Rural Telecomms.*, 221 F.R.D.523, 529 (C.D.Cal. 2004).  See also *In re Mego Fin. Corp.*, 213 F.3d at 459 (single objection out of a potential class of 5400) and even *Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir.2004) (500 opt-outs and *45 objections* out of approximately 90,000 notified Class Members still deemed a positive reaction).  Here, with notice going to over 17,000 addresses, that there has been no objectors strongly favors the presumption that the Settlement is favorable to the class.

As to opt-outs, the statistics are similarly compelling.  To this point, far fewer than one percent of Class Members have opted out.  In *Chun-Hoon v. McKee Foods Corp.*, 716 F.Supp.2d 848, 858 (N.D.Cal. 2010) even though opt-outs comprised fully 4.86% of the class, the Court still found a positive response by the class warranting the presumption of favorability.

### V.   CLASS COUNSELS' FEE IS REASONABLE AND SHOULD BE APPROVED

These fees being requested by Class Counsel are justifiable under either a common fund or lodestar basis.   But before getting into the nitty gritty of the factors relevant under each standard,

-16-

1   there is the over-arching fact that Class Counsel achieved an extraordinary result by this Settlement

2   and did so at mush risk.   See *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th

3   Cir.1993)(success of litigation is relevant to fee that should be awarded); *Six (6) Mexican Workers v.*

4   *Ariz. Citrus Growers*, 904 F.2d at 1311 (9th Cir.1990) (noting plaintiffs' "substantial success" in the

5   litigation in setting a fee); and *Vizcaino*, 290 F.3d at 1048 ("Risk is a relevant circumstance" to

6   establishing fees).

7        As already detailed above, plaintiffs' counsel achieved a near total victory in this case and

8   with much risk.  Prior to this case being filed, and even after, there were no others willing to take the

9   substantial risk plaintiffs' counsel undertook in fighting a major mortgage servicing company like

10  OCWEN in a class action based on a legal issue where case-authority is not only sparse, but where

11  there is now at least one district court opinion (*Smith*) that holds that the IRS has exclusive

12  enforcement authority over Section 6050H.  See also Wagner Decl., ¶¶ 11-12.

13       The relative speed with which plaintiffs were able to achieve Settlement also supports the fee

14  award.  Had the parties not resolved the action expeditiously, some borrowers may have been barred

15  from amending their tax returns because taxpayers may only do so within three years from filing of

16  their original return.  In short, more litigation and the resulting delay could easily have prejudiced

17  Class Members.

18       The Ninth Circuit has stated that a "reasonable" attorney fee in a common fund class action is

19  dependent upon "all the circumstances of the case," with the benchmark being 25%, and 33% being

20  the (apparent) maximum based on the success of the litigation.  See *Vizcaino v. Microsoft Corp.*, 290

21  F.3d 1043, 1048–50 (9th Cir.2002) and *In re Pac. Enters. Secs. Litig.*, 47 F.3d 373, 379 (9th

22  Cir.1995).  Alternatively, a loadstar approach can be utilized.  *Fischel v. Equitable Life Assurance*

23  *Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002).  Always, "[t]he ultimate goal is to award a

24  reasonable fee."  *Hartless v. Clorox*, 273 F.R.D. 630, 645 (S.D.Cal.2011).

25       Ninth Circuit case law makes clear that the value of a settlement under a common fund

26  approach should not be narrowly measured by "how much money a company spends on purported

27  benefits, but the value of those benefits to the class."  *In re Bluetooth Headset Prods. Liab. Litig.*,

28

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF
CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**

1   654 F.3d 935, 942 (9th Cir. 2011).  *Vizcaino* also makes clear that where counsel's performance

2   generates quantifiable benefits beyond a purely cash settlement, those are entitled to be valued for

3   purposes of establishing the legal fee.  *Id.* at 1049 ("As a result of settlement, Microsoft hired

4   roughly 3000 Class Members as regular employees and changed its personnel classification practices

5   resulting in a benefit of $101.48 million.")

6          Here, the majority of the value of the Settlement to Class Members comes in the form of the

7   $19,465,585 in tax benefits Class Members have received per the *Horn* formula from having their

8   interest payments properly reported in 2013 and 2014.  Adding to this amount the $556,080 in

9   $35.00 cash payments and the $55,000 in class administration costs, the Settlement has a combined

10  value of $20,076,665.  (See *Weeks v. Kellogg Co.*, 2013 WL 6531177 *29 (C.D.Cal. 2013) (class

11  administration costs are properly included in assessing the value of a class action settlement)).

12         The $425,000 legal fee being requested is just over 2% (.0211) of this amount and is entirely

13  reasonable under the circumstances of this case.  See Wagner Decl., ¶¶ 10-14.  This is especially true

14  given the additional value Class Members who still have their loans being serviced by OCWEN will

15  receive by the fact that OCWEN's has agreed (subject to no contrary guidance or case law being

16  issued) to continue reporting Negative Amortization payments in future years.

17         The process that was used for setting the legal fee – with the aid of a well-respected mediator

18  and only after the class relief has been fully agreed to – has also been specifically approved by the

19  Ninth Circuit in common fund cases.  In *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir.

20  1988) the Ninth Circuit held that the district court could properly "relied on the mediator as

21  independent confirmation that the fee was not the result of collusion or a sacrifice of the interests of

22  the class.")  *Hanlon*, 150 F.3d at 1029.  The protective process of using a mediator to negotiate fees

23  after the class recovery is set eliminates the "adversarial relationship" described in *In re Mercury*

24  *Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir.2010) in which the attorneys' fee is to come

25  directly out of a "common fund," i.e. where every dollar the attorneys get is one less that is gotten by

26  the class.  See also *Eisen v. Porsche Cars North America, Inc.*, 2014 WL 439006 *10 (C.D.Cal.

27  2014).

28

-18-

1    Alternatively, the requested fee is also justifiable on a lodestar basis.  Class Counsel

2    previously submitted their time records to the Court in the preliminary approval process.  The Court

3    reviewed those time records and concluded in preliminarily approving the settlement that the

4    proposed fee was in line with Class Counsel's lodestar.  Class Counsel have now updated their

5    declarations with the additional time they have incurred through the filing of this motion.  In total,

6    their lodestar without costs is now $440,164 -- ($285,694 (MPP) + $154,470 (Brown).  See Exhibit

7    "A" to Vendler and Brown Decls.  In addition, Class Counsel's reasonably incurred costs total

8    $7,521 ($5,330 + $2,191) of which the majority was for mediation fees.  *Id.*

9    Given all of these considerations, Plaintiffs' counsel's request that the Court award them the

10   $425,000 fee award (inclusive of their costs incurred) provided for in the Settlement.

11   **VI.    ENHANCEMENT TO THE CLASS REPRESENTATIVE**

12   It is well established that District courts have the discretion to award Case

13   Contribution/Incentive Awards named plaintiffs as compensation for their actions taken on behalf of

14   the class.  *Staton* at 327 F.3d 977.  Here, the $7,500 to be awarded to the two Named Plaintiffs

15   ($3,750 each) is well within the normal range of such awards.  See, e.g. *Pelletz v. Weyerhaeuser Co.*,

16   592 F.Supp.2d 1322, 1330 (W.D.Wash.2009) (approving incentive award of $7,500) and *Jacobs v.*

17   *Cal. State Auto. Ass'n Inter–Ins. Bureau*, 2009 WL 3562871 (N.D.Cal. 2009) (awarding incentive

18   payment of $7,500).  Indeed, awards of up to $25,000-$50,000 have been approved in many cases

19   within the Ninth Circuit.  See *Singer v. Becton Dickinson and Co.*, 2010 WL 2196104 (S.D.Cal.

20   2010); *Louie v. Kaiser Foundation Health Plan, Inc.*, 2008 WL 4473183 (S.D.Cal. 2008); *Glass v.*

21   *UBS Fin. Servs.*, 2007 WL 221862 * 16–17 (N.D.Cal. 2007); *Van Vranken v. Atl. Richfield Co.*, 901

22   F.Supp. at 299 (N.D.Cal.1995); *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385 (N.D.Cal. 2011); and

23   *Presley v. Carter Hawley Hale Profit Sharing Plan, No. C9704316SC*, 2000 WL 16437 *2 (N.D.

24   Cal. 2000).

25   Both Named Plaintiffs have spent substantial time on this case: (a) attempting to resolve the

26   matter with OCWEN before being forced to litigate, (b) securing qualified counsel, (c) conferring

27   with counsel on multiple occasions helping to formulate the complaint, (d) participating generally in

28

the strategy of the litigation and reviewing the major pleadings, and (e) participating (by phone) in the mediation which resulted in a Settlement.   Vendler Decl., ¶ 34.   For this reason, the Case Contribution Award sought should be granted.

## VII.   **CONCLUSION**

For all the foregoing reasons, this Court should grant this motion by finally approving the Settlement, entering judgment thereon, approving payment of plaintiffs' attorneys' fees in the amount of $425,000, and approving $7,500 to the two Named Plaintiffs ($3,750 each).

Date: September 14, 2015                         Respectfully submitted,


By: _____ */s/ David J. Vendler* _____
David J. Vendler
dvendler@mpplaw.com
MORRIS POLICH & PURDY LLP
1055 West Seventh Street, 24th Floor
Los Angeles, CA 90017
Telephone:    (213) 891-9100
Facsimile:    (213) 488-1178

Michael R. Brown, Esq. (SBN 65324)
mbrown@mrbapclaw.com
MICHAEL R. BROWN, APC
18101 Von Karman Avenue, Suite 1900
Irvine, California 92612
Telephone:    (949) 435-3888
Facsimile:    (949) 435 3801

Attorneys for Plaintiffs GEORGE CAMBERIS and CLAUDIA CAMBERIS, and all others similarly situated

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF CLASS COUNSEL'S FEES, AND CLASS PLAINTIFFS' INCENTIVE AWARD**