United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE L. CAMBERIS, et al., <br> Plaintiffs, <br> v. <br> OCWEN LOAN SERVICING LLC, <br> Defendant. | Case No. 14-cv-02970-EMC <br><br> **ORDER RE DEFENDANT'S MOTION FOR COURT APPROVAL OF PROPOSED DISTRIBUTION OF UNCLAIMED CLASS ACTION SETTLEMENT FUNDS** <br><br> Docket No. 82 |

Plaintiffs George and Claudia Camberis ("Plaintiffs") filed this class action lawsuit against Defendant Ocwen Financial Corporation ("Ocwen"). Plaintiffs allege that Ocwen failed to report, as required by 26 U.S.C. § 6050H, negative amortization mortgage interest that Plaintiffs and other similarly situated homeowners had paid to the IRS for tax year 2013, causing them to lose substantial tax deductions. *See* Docket No. 1 (Compl.), ¶¶ 1–5. The parties reached a proposed settlement agreement, and the Court granted final approval of the agreement on December 7, 2015. *See* Docket No. 80 (Order). To date, approximately $108,000 in settlement funds have not been claimed. Docket No. 82-1, ¶ 7. Pending before the Court is Ocwen's motion[1] for court approval of its proposed distribution plan for the unclaimed funds.

For the reasons stated below, the Court **ORDERS** the following:

(1) Ocwen shall pay the $53,014.01 owed to the Claims Administrator for the initial distribution;

---

[1] Ocwen's motion was originally characterized as unopposed, but the supplemental briefing stated that "The Parties are not in agreement regarding how the $108,500 in unclaimed settlement funds . . . should be distributed." Docket No. 85 at 1.

1     (2) The parties shall carry out a secondary distribution sending $6.76 to each of the 16,047
2         class members who cashed their initial checks;
3     (3) Any remaining funds unclaimed after the secondary distribution shall be allocated to cover
4         the administrative costs of the secondary distribution, and Ocwen shall bear any additional
5         costs not covered by the unclaimed funds;
6     (4) If the funds unclaimed after the secondary distribution exceed the administrative costs of
7         the distribution, the leftover funds will be donated to HomeFree via *cy pres*.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Court granted preliminary approval of the class action settlement agreement on August 11, 2015, *see* Docket No. 62, and final approval on December 7, 2015, *see* Docket No. 80. Ocwen agreed to issue corrected IRS Forms 1098 for the year 2013 to all class members, to report the proper amount of mortgage interest they paid in 2013, including repayments of negative amortization. *See* Docket No. 50-2 (Settlement Agreement) at § 2.01. Ocwen also agreed to pay each class member $35 for every amended Form 1098 that Ocwen files for that class member to help defray the cost of filing amended tax returns. *Id.* at § 2.02. In addition, Ocwen made a system-wide correction so that repayments of negative amortization would be properly reported in future years. *Id.* at § 2.05. Finally, Ocwen agreed to pay the class counsel's fees and costs, an incentive award to named Plaintiffs, and all costs of class administration. *Id.* at §§ 3.07, 4.02, 4.03. However, the settlement agreement did not specify how unclaimed settlement funds would be distributed. Docket No. 82-1, ¶ 8.

As of August 15, 2018, approximately $108,000 of the settlement funds remained unclaimed. *Id.* ¶ 7. The claims administrator is owed $53,014.01 in fees. *Id.* Because the settlement agreement did not address unclaimed funds, the parties engaged in supplemental discussions. *Id.* ¶ 8. They agreed that the claims administrator should be allowed to deduct $53,014.01 from the unclaimed funds to pay its outstanding fees, and the remainder should be returned to Ocwen to donate to charity. *Id.* ¶ 9. Ocwen proposed that $40,000 of the funds should be donated to HomeFree USA, and the remainder of approximately $14,000 be donated to Habitat for Humanity, Buffalo. *Id.* ¶¶ 10–11. According to Ocwen, both are "housing-based charities,"

which is appropriate given the "lawsuit involved home mortgage issues." *Id.* ¶ 12. The two charities are described in more detail below.

The proposed plan did not, however, address whether it would be practicable to distribute the residue of the fund to class members, which is a predicate question that must be resolved before resorting to *cy pres*. The Court therefore ordered supplemental briefing. *See* Docket No. 84. The parties filed a responsive brief on September 17, 2018, in which they disagreed on how to conduct a second round of distribution. *See* Docket No. 85.

Ocwen's position: Ocwen proposes that all unclaimed funds should be donated to charity under the *cy pres* doctrine. *See id.* at 2. Alternatively, Ocwen admits that a secondary distribution to class members is possible, but argues that the administrative cost of such a distribution should be deducted from the residual fund, rather than borne by Ocwen (although Ocwen agreed to pay all fees and costs for the first distribution). *See id.* at 2. It suggests that any remaining funds unclaimed after the secondary distribution be donated to the charities described above, instead of being processed in a third round of distributions. *Id.* at 2–3.

Plaintiffs' position: Plaintiffs propose that the remaining funds be distributed to class members, and that Ocwen should cover the administrative costs of the secondary distribution. *Id.* at 4. Plaintiffs agree with Ocwen that any funds remaining after the secondary distribution can be donated to "an appropriate charity," without indicating that they approve of the two organizations Ocwen proposed. *Id.*

## II. DISCUSSION

A. Legal Standard

The *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to indirectly benefit the entire class. *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). But "before a court invokes its *cy pres* power . . . it must ask three questions: (1) to whom does the residue belong, (2) would it be practicable to distribute the residue to its owners and (3) if not, who is an appropriate alternate recipient?" *In re Wells Fargo Sec. Litig.*, 991 F. Supp. 1193, 1195 (N.D. Cal. 1998) (citing Herbert Newberg and Alba Conte, *Newberg on Class Actions*, §§ 10.15–10.17 (3d ed. 1992)).

This reflects "the law's general preference for *cy pres* awards to be limited to scenarios where it is not feasible to make further distributions to class members." *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3872788, at *26 (N.D. Cal. Aug. 15, 2018) (citing *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)); *see also* Principles of the Law of Aggregate Litig. § 3.07(c) (Am. Law Inst. 2010) ("If the court finds that individual distributions are not viable . . . the settlement may utilize a *cy pres* approach.").

If the court does determine that the unclaimed settlement funds cannot be practicably distributed to the class members, the resultant *cy pres* distribution must be "guided by (1) the objectives of the underlying statute(s); and (2) the interests of the silent class members," such that there is "a driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Nachshin*, 663 F.3d at 1038–39. The court should also "account for the nature of the plaintiffs' lawsuit." *Id.* at 1036.

B. <u>Secondary Distribution</u>

The parties' supplemental briefing makes clear that a secondary distribution of the remaining funds to class members is practicable. The only point of contention is whether Ocwen should bear the administrative costs of the distribution, or if the costs can be deducted from the fund.

During the initial distribution, 16,047 of the 19,147 class members cashed their checks. *See id.* at 2. The Claims Administrator estimates that it will cost $27,400 to conduct a secondary distribution. *See id.* If the $108,500 in unclaimed funds is redistributed in full to the 16,047 class members who cashed their initial checks, as Plaintiffs propose, each member will receive $6.76. *See id.* at 3. However, if the administrative cost is deducted from the fund before redistribution, as Ocwen proposes, each class member will receive $5.05. *See id.*

Ocwen argues that it should not have to pay the costs of the secondary distribution for two reasons. First, the settlement agreement apparently only contemplated one round of distribution. *See* Docket No. 50-2, § 5.02. Second, the Court's Order granting final approval of the settlement agreement noted that the expected class administration costs would be $55,000, *see* Docket No. 80 at 3, and Ocwen has already agreed to pay the $53,014.01 owed to the Claims Administrator for

4

the initial distribution. While there is some merit to Ocwen's position, the settlement agreement also provides, without any limitations, that "Ocwen shall also pay the Claims Administrator's fees and costs." Docket No. 50-2, § 3.06. Moreover, although Ocwen characterizes the difference between each class member receiving $6.76 and $5.05 in the secondary distribution as "de minimum," Docket No. 85 at 3, that difference in fact represents an approximate decrease of 25%.

On balance, the Court determines that it would be equitable to distribute the full $6.76 amount to each class member and use any funds still unclaimed after the secondary distribution to cover the administrative costs. *See Six Mexican Workers*, 904 F.2d at 1307 ("Federal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds."). If the administrative costs exceed the amount of unclaimed funds, Ocwen shall cover the remaining costs. Such an arrangement provides the class members an additional opportunity to claim the remaining class funds while defraying the administrative costs for Ocwen. *See Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 117 (D.D.C. 2015) (noting that "as a general matter, 'a court's goal in distributing class action damages is to get as much of the money to the class members in as simple a manner as possible'") (quoting Herbert Newberg et al., *Newberg on Class Actions*, § 12.28 (5th ed. 2015)); *see also Hester v. Vision Airlines, Inc.*, No. 2:09-CV-00117-RLH, 2017 WL 4227928, at *2 (D. Nev. Sept. 22, 2017) (stating that "redistribution of unclaimed class action funds to existing class members is proper and preferred" because it "ensures that 100% of the [settlement] funds remain in the hands of class members" and "class settlements rarely 'pay individual class members the full value of their claims'") (quoting *Newberg on Class Actions*, § 12.30 (5th ed. 2015)).

In the event that unclaimed funds still remain after the costs of the secondary distribution are paid, donation to a *cy pres* recipient is appropriate.

C. Cy Pres

Ocwen proposes HomeFree USA and Habitat for Humanity Buffalo as *cy pres* recipients. The HomeFree USA website describes the organization as

> a leading [United States Department of Housing and Urban Development or "HUD"]-approved homeownership development, foreclosure intervention and financial coaching organization. We

5

> improve the financial position and enrich the lives of everyday people through homeownership and improved financial capability. Since 1995, HomeFree-USA has helped 24,009 families experience the accomplishment and joy of purchasing their first home. We have also helped thousands of homeowners to prevent foreclosure.
>
> Our mission is to be the premier bridge to financial strength and homeownership success for people of color across America.
>
> We strengthen people, properties and partners.
>
> As a HUD Intermediary, HomeFree-USA oversees a countrywide network of more than 50 affiliated community and faith-based housing counseling agencies that served 47,171 homebuyers, homeowners and renters last year. Our network represents the diverse interests of 4.5 million consumers.

"About Us," http://www.homefreeusa.org/aboutus (last visited Sept. 4, 2018). It is a 501(c)(3) nonprofit. *See* Donation/Payment Form, https://ww2.homefreeusa.org/ (last visited Sept. 4, 2018).

The Habitat for Humanity website describes the organization as

> a global nonprofit housing organization working in local communities across all 50 states in the U.S. and in approximately 70 countries. Habitat's vision is of a world where everyone has a decent place to live.
>
> Habitat works toward our vision by building strength, stability and self-reliance in partnership with families in need of decent and affordable housing. Habitat homeowners help build their own homes alongside volunteers and pay an affordable mortgage.

About Habitat for Humanity, https://www.habitat.org/about (last visited Sept. 4, 2018). In particular, the Habitat for Humanity Buffalo affiliate describes itself thus:

> ***Habitat for Humanity Buffalo makes homeownership possible for local families.*** Since 1985, we have assisted 294 families in achieving their dream of homeownership. Families in Habitat Buffalo's homebuyer program are able to purchase a decent, safe, affordable home. This is attainable for low-income families because Habitat Buffalo subsidizes the cost of the house through grants, donations, and volunteer labor. The homebuyer repays an **interest-free**, 30-year mortgage, which supports the *Fund for Humanity*, a revolving account used to build additional homes
>
> ***We give a hand up, not a hand out.*** Working closely with families in our homebuyer program, we help to prepare them for the challenges that go along with owning a house. Families are required to complete 500 hours of "sweat equity", a term used to describe the work completed by future homeowners towards the construction and purchase of their homes. Families help to build their house, and must also attend budgeting and first-time homebuyer classes.

"About Us," https://www.habitatbuffalo.org/about-us/ (last visited Sept. 4, 2018). Habitat for

Humanity is also a 501(c)(3) nonprofit. *See* Tax Information, https://www.habitat.org/support/tax-information (last visited Sept. 4, 2018).

Plaintiffs objected to Ocwen's choice of charities. First, they contended that both HomeFree USA and Habitat for Humanity are faith-based organizations. *Id.* ¶ 13. Ocwen responded that HomeFree USA is not faith based, and while Habitat for Humanity is "technically . . . affiliated with the Christian religion, it does not exclude services to people of other faiths and its mission is undeniably egalitarian." *Id.* ¶¶ 14–15. Second, Plaintiffs objected to Habitat for Humanity, Buffalo on the basis that it is not a national charity. *Id.* ¶ 16. Ocwen in turn argues that "[w]hile Habitat for Humanity, Buffalo is location specific, the charity as a whole is national, and there is no legitimate reason to object to the usage of funds by the Buffalo division as opposed to any other division." *Id.* Ultimately, Plaintiffs did not oppose Ocwen's filing of the instant motion, but refused to withdraw their objections to the two proposed charities. *Id.* ¶ 18.

The Ninth Circuit has instructed that a *cy pres* distribution must be guided by "the objectives of the underlying statute(s)", the "interests of the silent class members," and "the nature of the plaintiffs' lawsuit." *Nachshin*, 663 F.3d at 1036, 1038–39. Plaintiffs here primarily allege violations of 26 U.S.C. § 6050H, which "requires any individual who receives interest aggregating over $600 on a mortgage in a given year from another individual to furnish the Internal Revenue Service ('IRS') with an information return identifying the amount of interest received." *Rovai v. Select Portfolio Servicing, Inc.*, No. 14-CV-1738-BAS-WVG, 2018 WL 3140543, at *2 (S.D. Cal. June 27, 2018) (citing 26 U.S.C. § 6050H(a); 26 U.S.C. § 6050H(b)(2)(B)). The objective of § 6050H is to "assist the [IRS] in verifying the accuracy of claimed mortgage interest deductions." Joint Comm. on Taxation, H.R. 4170, 98th Cong. P. L. 98-369, Gen. Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 488 (Dec. 31, 1984). By doing so, § 6050H benefits homeowners by allowing them to obtain tax deductions.

HomeFree USA, as an organization that promotes homeownership by providing financial and mortgage literacy resources to homebuyers and homeowners, comports with the purpose of § 6050H. *See* Financial FAQ, http://www.homefreeusa.org/financial_faq (last visited Sept. 4, 2018). These resources could conceivably "aid class members or similarly situated parties in the

future." *In re Wells Fargo*, 991 F. Supp. at 1198. HomeFree USA therefore relates to the nature of Plaintiffs' lawsuit, which concerns homeowners' awareness of their rights regarding mortgage loans, and aligns with the interests of the silent class members. Moreover, although HomeFree USA's nationwide network of affiliates includes "ethnically and culturally diverse *faith* and community-based nonprofit partners," there is nothing to suggest that HomeFree USA is itself a faith-based organization, contrary to Plaintiffs' objection. Our Affiliates, http://www.homefreeusa.org/affiliates (last visited Sept. 4, 2018) (emphasis added).

On the other hand, the nexus between Habitat For Humanity Buffalo and the interests of Plaintiffs is tenuous. Like HomeFree USA, Habitat For Humanity provides financial literacy resources for homebuyers and homeowners. *See* Financial Education, https://www.habitat.org/impact/our-work/financial-education (last visited Sept. 4, 2018). However, Defendants have not offered any explanation for the choice of Habitat for Humanity's Buffalo affiliate specifically. The named Plaintiffs reside in California, and the class members "reside in and are located throughout the United States and in foreign jurisdictions." Compl. ¶¶ 35–36. Ocwen is a Florida corporation with its principal place of business in Georgia. *Id.* ¶ 37. The choice of Buffalo appears to be arbitrary and unrelated to the geographic scope of the class. *See Nachshin*, 663 F.3d at 1040 (finding that proposed *cy pres* distribution inappropriately "fails to target the plaintiff class, because it does not account for the broad geographic distribution of the class," where class included "more than 66 million AOL subscribers throughout the United States" but "two-thirds of the donations will be made to local charities in Los Angeles").

Accordingly, the Court determines that HomeFree USA shall be the *cy pres* recipient of any settlement funds remaining after the secondary distribution.

### III. CONCLUSION

In sum, the Court **ORDERS** the following:

(1) Ocwen shall pay the $53,014.01 owed to the Claims Administrator for the initial distribution;

(2) The parties shall carry out a secondary distribution sending $6.76 to each of the 16,047 class members who cashed their initial checks;

8

(3) Any remaining funds unclaimed after the secondary distribution shall be allocated to cover the administrative costs of the secondary distribution, and Ocwen shall bear any additional costs not covered by the unclaimed funds;

(4) If the funds unclaimed after the secondary distribution exceed the administrative costs of the distribution, the leftover funds will be donated to HomeFree USA via *cy pres*.

This Order disposes of Docket No. 82.

**IT IS SO ORDERED**.

Dated: November 20, 2018

EDWARD M. CHEN
United States District Judge